J-A02020-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| APPALACHIAN TIMBER PRODUCTS, INC., AND SUMMIT FOREST RESOURCES, INC. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LUTHER P. MILLER, INC. | : | No. 832 WDA 2019 |
| | : | |
| Appellant | : | |

Appeal from the Judgment Entered May 20, 2019
In the Court of Common Pleas of Somerset County Civil Division at
No(s):  No. 613 Civil 2015

BEFORE:  SHOGAN, J., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                                    FILED MAY 27, 2020

Appellant, Luther P. Miller, Inc., appeals from the judgment entered on May 20, 2019 following a jury trial that produced a verdict in favor of Appalachian Timber Products, Inc. and Summit Forest Resources, Inc. (collectively referred to as "Appalachian Timber") on breach of contract claims. We affirm.

The trial court summarized the facts and procedural history of this case as follows:

This case began with [Appalachian Timber] filing a complaint [against Appellant] on October 16, 2015 asserting claims for breach of contract and fraud. [Appalachian Timber] alleged that[,] from 2005 to October 6, 2014[,] Appellant engaged in a scheme in which Appellant billed [Appalachian Timber] for [gallons of fuel that] Appellant knowingly failed to deliver to [Appalachian Timber's] sawmill facility located [in] Markleysburg, Pennsylvania. Accordingly, [Appalachian Timber] requested

damages totaling $429,447.38 representing 33 ¹/₃ % of the fuel gallons [for which Appalachian Timber paid but Appellant failed to deliver]. Appellant filed [its] answer and new matter on December 11, 2015 in which [it] averred [it] did not breach the agreement between the parties, nor made any false representations to [Appalachian Timber] regarding fuel delivery. Appellant further contended that an internal investigation conducted by Appellant following [Appalachian Timber's] allegations disclosed no irregularities in [the] amount of fuel delivered to [Appalachian Timber].

\*　　　\*　　　\*

[The trial court] conducted a pre-trial conference with the parties on October 5, 2018, following which, Appellant filed a motion in limine to exclude witness testimony and a motion in limine to exclude irrelevant documentary evidence on October 12, 2018. With respect to [] Appellant's motion and brief in support related to alleged irrelevant witness testimony, Appellant contended[, inter alia, that] eight of [Appalachian Timber's] proposed witnesses would offer testimony prohibited by Pa.R.E. 40[4](b) regarding improper use of character evidence. According to [Appalachian Timber], the proffered testimony of the witnesses at issue only served to "explain the complete picture of the scheme carried out by [Appellant]," and therefore did not run afoul of Pa.R.E. 40[4](b) restrictions on "other act" character evidence. As outlined in their brief in opposition, [Appalachian Timber] averred that many of the witnesses would describe analogous instances in which Appellant billed other entities for gallons of fuel which Appellant did not ultimately deliver. Following oral argument on Appellant's motions, [the trial court] issued an order granting Appellant's motion in limine in part, but denying the motion with respect to the testimony of Wayland King, a representative of R.W. Frazee Trucking, and two [of Appellant's] former employees, Bob Shope and Jason Gibbs. On October 22, 2018, [the trial court] ordered that the case be scheduled for a three-day jury trial.

Prior to the start of trial, [the trial court] granted [Appalachian Timber's] motion to amend complaint, in which [Appalachian Timber] identified numerous errors contained within the original complaint filed October 16, 2015, thereby altering the total sum of damages requested. Consequently, the amended complaint averred that, on average, Appellant delivered 42% less fuel gallons per delivery to [Appalachian Timber] than was required by

agreement – and for which [Appalachian Timber was] ultimately billed and paid for – and amended [its] claim for damages to reduce the total sum claimed to $416,268.95. The case proceeded to a jury trial on November 5-7, 2018. At the close of [Appalachian Timber's] case, Appellant moved for a nonsuit and directed verdict, which [the trial court] denied. At the conclusion of the trial, the jury entered a verdict in favor of [Appalachian Timber] in the amount of $416,286.00.

Appellant filed [a] motion for post-trial relief on November 19, 2018, arguing that (1) the evidence presented at trial was insufficient to establish the elements of [Appalachian Timber's] breach of contract claim; (2) the jury's verdict was against the weight of the evidence; (3) the [trial c]ourt's admission of the testimony of Wayland King required a new trial; and (4) the jury's damage [] award was substantially larger than warranted by the evidence and [required remittance]. On May 9, 2019, [the trial court] issued an order denying [Appellant's] motion for post-trial relief. Appellant filed [a] notice of appeal on May 30, 2019. On May 31, 2019, [the trial court] ordered [] Appellant [to] file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b), with which [Appellant] complied [] on June 20, 2019.

Trial Court Opinion, 8/15/2019, at 1-4 (record citations and superfluous capitalization omitted).

On appeal, Appellant presents the following issues for our review:

I. Did the trial court err and/or abuse its discretion in admitting testimony from a non-party witness who testified that Appellant committed similar bad acts in its dealings with the non-party as Appellant allegedly committed in its dealings with [Appalachian Timber]?

II. Did the trial court err and/or abuse its discretion in denying Appellant's request for judgment notwithstanding the verdict [(JNOV)], where there was insufficient evidence supporting the jury's verdict regarding any pre-2011 breach of contract and damages?

Appellant's Brief at 5.

In its first issue presented, Appellant claims that the trial court erred by failing to grant its motion in limine to exclude Wayland King, a representative from R.W. Frazee Trucking, from testifying that Appellant billed a third-party entity for undelivered fuel. Appellant's Brief at 10-19. Appellant contends that Appalachian Timber sought to prove its case by showing Appellant engaged in a similar act, at a different time, in order to establish that Appellant acted in conformity with that prior act in the current case. Id. at 11-12. Appellant further contends that "[t]his evidence was inadmissible, as it was irrelevant, unduly prejudicial, and impermissible 'bad act' evidence that should have been excluded." Id. at 10. Appellant argues that "[t]he trial court's decision to admit Mr. King's testimony under Rule of Evidence 404(b)(2) was error and/or an abuse of discretion[, because n]one of the exceptions listed in Rule [] 404(b)(2), or otherwise embodied in the case law, applies here." Id. at 15. Appellant maintains that this matter entails an action for breach of contract and damages between Appellant and Appalachian Timber, "neither of which had anything to do with Mr. King's employer" and that "a common scheme or plan was not at issue." Id. Appellant concludes that it was prejudiced by the introduced testimony and is entitled to a new trial. Id. at 18.

We adhere to the following standard of review:

Admission of evidence is within the sound discretion of the trial court and we review the trial court's determinations regarding the admissibility of evidence for an abuse of discretion. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. For

evidence to be admissible, it must be competent and relevant. Evidence is competent if it is material to the issue to be determined at trial. Evidence is relevant if it tends to prove or disprove a material fact. Relevant evidence is admissible if its probative value outweighs its prejudicial impact. The trial court's rulings regarding the relevancy of evidence will not be overturned absent an abuse of discretion.

Pursuant to Rule of Evidence 402, relevant evidence is generally admissible, and irrelevant evidence is inadmissible. Further, relevant evidence may be excluded if its probative value is outweighed by its potential for unfair prejudice, defined as a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially.

*Czimmer v. Janssen Pharmaceuticals, Inc.*, 122 A.3d 1043, 1058 (Pa. Super. 2015) (citation omitted).

Moreover, pursuant to Pennsylvania Rule of Evidence 404(b):

(b) Crimes, Wrongs or Other Acts.

(1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

(2) Permitted Uses. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa.R.E. 404(b).

An en banc panel of this Court has explained:

Evidence of prior [acts] is not admissible for the sole purpose of demonstrating a [] propensity to commit [other acts]. Nevertheless, evidence may be admissible in certain circumstances where it is relevant for some other legitimate purpose and not utilized solely to blacken a defendant's character.

Specifically, other [bad acts] evidence is admissible if offered for a non-propensity purpose, such as proof of an actor's knowledge, plan, motive, identity, or absence of mistake or accident. When offered for a legitimate purpose, evidence of prior [acts] is admissible if its probative value outweighs its potential for unfair prejudice.

When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each [] incident to assure that the evidence reveals [] conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator [], as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each [] incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive. Finally, the trial court must assure that the probative value of the evidence is not outweighed by its potential prejudicial impact upon the trier of fact.

Commonwealth v. Tyson, 119 A.3d 353, 358–359 (Pa. Super. 2015) (en banc).

Our Supreme Court "has also recognized the res gestae exception, permitting the admission of evidence of other crimes or bad acts to tell 'the complete story.'" Commonwealth v. Hairston, 84 A.3d 657, 665, 624 Pa. 143, 157 (Pa. 2014). Recently, we reiterated that evidence pursuant to Pa.R.E. 404(b)(2) is admissible in civil proceedings. See Hoak v. Newton, 2019 WL 3302614 (Pa. Super. July 23, 2019),[1] citing Homewood People's

_____

[1] See Pa.R.A.P. 126(b) (unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019 may be cited for their persuasive value).

- 6 -

Bank v. Marshall, 72 A. 627 (Pa. 1909).  Appellant concedes that Rule 404(b)

is applicable in the civil context.  See Appellant's Brief at 11.

On this issue, the trial court determined:

With respect to King, an employee of R.W. Frazee Trucking, [Appalachian Timber] averred that the witness would describe a scenario involving Appellant which closely resembled the facts underlying [Appalachian Timber's] claim in the instant matter.  As [Appalachian Timber] noted, King observed a delivery truck belonging to Appellant arrive at his employer's facility and begin pumping fuel into a holding tank with roughly 300 gallons of fuel already registered on the delivery truck's fuel meter.  According to King, the driver of the delivery truck was Rodney Kreger – the same driver that delivered fuel to [Appalachian Timber] from Appellant's Confluence branch.  [In permitting King's testimony, the trial court] noted the undeniable parallels among the allegations set forth by King, and those which formed the basis of [Appalachian Timber's] claim against Appellant.

\* \* \*

At trial, King provided testimony regarding two incidents in which Rodney Kreger, on behalf of Appellant, delivered fuel to R.W. Frazee Trucking at their facility in Addison, Pennsylvania.  With respect to both incidents, King stated that he witnessed Kreger pull into the facility, drive directly to the fuel tank and begin filling the tanks.  According to King, before Kreger began pumping fuel on both occasions, the fuel meter on the delivery truck already registered roughly 250 and 175 gallons of fuel respectively.  When asked whether the number of registered gallons reset to "zero" upon Kreger commencing the fuel delivery at the facility, King responded, "No."  King informed the owner of R.W. Frazee Trucking, Rick Frazee, who confronted Kreger about the discrepancy.  As a result, Kreger was required to alert King each time he delivered fuel to the Frazee facility to ensure that the fuel pump meter was reset to "zero" prior to filling the fuel tank.  Both events were alleged to have occurred within a week or two of each other in the summer or spring of 2014.

Similarly, John Merschat, owner of [Appalachian Timber], testified at trial to fuel delivery problems involving Appellant and Rodney Kreger at his sawmill located in Markleysburg, Pennsylvania.  As

Merschat recalled, a manager of Appalachian Timber, Craig Squibb, initially informed Merschat of a discrepancy involving 300 gallons of fuel reported[ly delivered to the sawmill, but for which receipt could not be confirmed].  Following a discussion on the matter, Merschat decided to address the issue with Rodney Kreger at his next-scheduled fuel delivery.  On October 6, 2014, Merschat observed Kreger arrive at the Appalachian Timber facility and proceed to a fuel tank on the premises.  Merschat proceeded to where the delivery truck was parked, estimating the time that elapsed between when Kreger parked the delivery truck and when Merschat arrived at the truck's location to be about 15 seconds.  When Merschat arrived, fuel was already being pumped into the fuel tank, but Kreger was not standing at the delivery truck. Merschat was surprised to find that the meter on the fuel pump indicated 330 gallons had already been pumped into the fuel tank – an amount Merschat believed to be impossible given that little time had elapsed after Kreger parked the delivery truck.  Indeed, as Kreger's testimony would later establish, the delivery truck typically pumped fuel at a rate of between 60 to 80 gallons a minute.  When Kreger returned to the truck, Merschat confronted Kreger about the discrepancy and asked him to leave the premises.

*          *          *

As [] detailed above, the incidents described by both Merschat and King regarding discrepancies in fuel delivered by Appellant are remarkably similar and occurred relatively close in time to one another in 2014.  As testimony established at trial, Appalachian Timber and [] King's employer, R.W. Frazee Trucking, are also located in close [physical] proximity to one another, and were serviced by the same regional fuel delivery facility operated by Appellant in Confluence, Pennsylvania.  Kreger regularly delivered fuel to both entities on behalf of Appellant, and more importantly, delivered fuel to both facilities during the incidents giving rise to the case sub judice.  Lastly, [] King and Merschat provided strikingly similar testimony regarding Appellant's manner and method of fuel delivery at both facilities – dispensing fuel without resetting the fuel pump meter to "zero" – and failing to account for such discrepancies when billing for any undelivered fuel.

Trial Court Opinion, 8/15/2019, at 6-9 (record citations omitted).

Upon review, we discern no abuse of discretion or error of law in admitting the other acts evidence at issue. Appellant defended against liability by asserting delivery of all fuel for which it billed Appalachian Timber. Appellant's Brief at 15. This defense squarely placed opportunity, preparation, and planning at issue during the trial. The commonality of factors between the incidents at Frazee Trucking and those at Appalachian Timber tended to show that Appellant possessed the capacity to pursue and execute a common scheme to deliver less fuel to Appalachian Timber, and other customers, than contractually obligated. The shared factors also dispelled the notion that the incidents were merely coincidental mistakes or accidents. Taken together with the evidence offered by Merschat, King's testimony showed that the same driver delivered less fuel to two of Appellant's customers by failing to reset the delivery truck pump to zero before dispensing fuel. This evidence developed a logical connection between the episodes and showed it to be more probable than not that the events occurred as a result of coordinated preparation and planning by a single perpetrator. The repeated and consistent actions of the same delivery driver employing identical methods to "short" Appellant's customers on their fuel requirements was relevant to establish both Appellant's opportunity and its intentional pursuit of in a common scheme to deliver less fuel than agreed upon. Moreover, King's testimony was proper under the res gestae exception to prior bad acts, in order to tell the complete story of Appellant's dealings. For all of the foregoing reasons, we discern no

abuse of discretion or error of law by the trial court in admitting the evidence at issue. As such, Appellant's first issue is without merit.

Next, Appellant contends that the trial court abused its discretion or erred as a matter of law by failing to grant a JNOV. Appellant maintains that although Appalachian Timber claimed damages for breach of contract for fuel deliveries from 2005 through 2014, it failed to provide sufficient evidence of fuel delivery invoices or logs predating 2011. Appellant's Brief at 19-22. More specifically, Appellant points to Exhibits 1 and 11 as presented by Appalachian Timber at trial, to support its claim that Appalachian Timber did not submit evidence of damages predating 2011. Id. at 20-21. As such, Appellant posits:

> In short, for the period before 2011, Appalachian [Timber] introduced at trial no direct or substantial evidence, whether documentary or testimonial in nature, establishing the amount of fuel [Appellant] delivered, the amount of money Appalachian [Timber] paid for that fuel [], and any discrepancy between the two. Without such evidence, for that period, any verdict in Appalachian [Timber's] favor against [Appellant] for breaching the parties' contract by delivering less fuel than that for which Appalachian [Timber] was billed was based purely on speculation and conjecture, rather than admissible evidence, circumstantial or otherwise.

Id. at 21-22 (citation omitted). Accordingly, Appellant requests this Court remand this case for entry of judgment in its favor or, alternatively, order a reduction of the adverse judgment by an amount equal to all damages allegedly stemming from pre-2011 deliveries. Id. at 22.

Our standard of review of a denial of a motion for JNOV is well-settled:

> Appellate review of a denial of JNOV is quite narrow. We may reverse only in the event the trial court abused its discretion or

committed an error of law that controlled the outcome of the case. Abuse of discretion occurs if the trial court renders a judgment that is manifestly unreasonable, arbitrary or capricious; that fails to apply the law; or that is motivated by partiality, prejudice, bias or ill-will.

When reviewing an appeal from the denial of a request for JNOV, the appellate court must view the evidence in the light most favorable to the verdict-winner and give him or her the benefit of every reasonable inference arising therefrom while rejecting all unfavorable testimony and inferences.... Thus, the grant of a judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict-winner. Furthermore, it is only when either the movant is entitled to judgment as a matter of law or the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant that an appellate court may vacate a jury's finding.

*Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932

(Pa. Super. 2013) (citations, quotations, and brackets omitted).

Our Supreme Court has held:

Where one party to a contract without any legal justification, breaches the contract, the other party is entitled to recover, unless the contract provided otherwise, whatever damages he suffered, provided (1) they were such as would naturally and ordinarily result from the breach, or (2) they were reasonably foreseeable and within the contemplation of the parties at the time they made the contract, and (3) they can be proved with reasonable certainty.

The purpose of a damage award is to place the non-breaching party as nearly as possible in the same position it would have occupied had there been no breach.

*Helpin v. Trustees of Univ. of Pennsylvania*, 10 A.3d 267, 270 (Pa. 2010)

(citations and quotations omitted).  "The law does not permit a damages

award to be based on mere guesswork or speculation, but rather requires a reasonable basis to support such an award." Id.

Additionally, as this Court has previously determined:

The general rule in this Commonwealth is that the plaintiff bears the burden of proof as to damages.

The determination of damages is a factual question to be decided by the fact-finder. The fact-finder must assess the testimony, by weighing the evidence and determining its credibility, and by accepting or rejecting the estimates of the damages given by the witnesses.

Although the fact-finder may not render a verdict based on sheer conjecture or guesswork, it may use a measure of speculation in estimating damages. The fact-finder may make a just and reasonable estimate of the damage based on relevant data, and in such circumstances may act on probable, inferential, as well as direct and positive proof.

Omicron Sys., Inc. v. Weiner, 860 A.2d 554, 564–565 (Pa. Super. 2004) (citation omitted).

Finally, we have concluded:

The test of whether damages are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages.

Thus, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount.

Wachovia Bank, N.A. v. Ferretti, 935 A.2d 565, 572 (Pa. Super. 2007) (citation, brackets and ellipsis omitted).

The trial court determined that Appalachian Timber presented sufficient evidence for the jury to estimate actual loss:

[Appalachian Timber presented] testimony and records from [its] own facility detailing the amount of fuel reported to have been delivered by Appellant, fuel usage at the Appalachian Timber facility, and Appalachian Timber's product output. Leslie Hutchinson, a bookkeeper at Appalachian Timber, testified that she noted discrepancies beginning in 2011, after observing that the number of fuel gallons delivered by Appellant far exceeded the number of gallons utilized by Appalachian Timber during its regular course of business. After Appalachian Timber utilized a different fuel delivery provider in October of 2014, Hutchinson testified that the number of fuel gallons for which Appalachian Timber was billed for similar production output decreased significantly. Likewise, John Merschat provided testimony regarding the average sum of fuel consumed [at] the sawmill in a month compared to the total sum delivered by Appellant. As Merschat noted, taken together, the records compiled by Appalachian Timber [suggest] that Appellant delivered 42% less than was ultimately billed to Appalachian Timber beginning in 2005. Accordingly, based upon this percentage, Merschat calculated Appalachian Timber's damages to be approximately $416,286.95.

Trial Court Opinion, 8/15/2019, at 14.

Accordingly, the trial court determined that the jury did not base its award upon speculation, but rather an estimate of damages based upon the evidence of record:

The testimony of John Merschat provided extensive evidence, which the jury was free to believe, regarding the estimated number of gallons of fuel consumed by the sawmill versus the amount of fuel delivered by Appellant beginning in 2005. In doing so, Merschat testified that between 2005 and October 2014, Appellant delivered [] approximately 42% less fuel than was represented on delivery receipts Appellant submitted to Appalachian Timber. In support of this allegation, Merschat provided testimony regarding Appalachian Timber's average monthly fuel consumption, product output, efficiency of machinery operated by the sawmill, and the precise number of gallons delivered to Appalachian by Appellant beginning in 2011. Furthermore, [Appalachian Timber] presented evidence regarding a substantial improvement in fuel efficiency after Appalachian

- 13 -

Timber began receiving fuel deliveries from another fuel delivery service, despite the fact that [Appalachian Timber] did not make any changes in the manner in which it operated its sawmill and equipment. As Merschat noted, the seeming increase in machine efficiency was particularly notable given the fact that the machines operated by the sawmill had aged and would presumably be less efficient. From these figures, [the trial court] believe[d] the jury was able to make a just and reasonable estimate of damages for fuel delivery discrepancies dating back to 2005, based upon the evidence and testimony provided by [Appalachian Timber].

Id. at 16-17 (record citations omitted).

Upon review, we agree. Initially, we note that upon our review of the certified record, Appalachian Timber's Exhibit #1 confirms that it only presented invoices and canceled checks for the sale of fuel from 2011-2014. Moreover, in calculating the 42% alleged shortage, Merschat testified that he relied solely upon record data from 2011-2014. N.T., 11/5/2018, at 132. However, Merschat also testified that the total amount paid to Appellant during the course of the parties' entire business relationship, from 2005 until 2014, totaled $991,159.40. Id. at 103. Merschat and his bookkeeper, Leslie Hutchinson, "added up all of the fuel deliveries from [Appellant] on a monthly basis, and [] averaged them out" to determine that Appalachian Timber purchased "733.8 gallons" of fuel per week during the period from 2005 until 2014. Id. at 92. This evidence was uncontested and Appellant does not currently challenge it. As such, we flatly reject Appellant's suggestion that there was no evidence of the amount of money Appalachian Timber paid Appellant or the amount of fuel allegedly purchased.

Additionally, after Appalachian Timber changed fuel providers, Merschat realized that Appalachian Timber was using approximately 300 gallons of fuel per week less than previously thought. Id. at 79, 96. Merschat explained how much fuel each machine in the timber mill used per week. Id. at 83. Appalachian Timber purchased each of those machines before 2005 and continued using them after Appellant stopped delivering fuel in 2014. Id. at 88-92. Merschat averaged the timber mill's monthly fuel consumption and compared it with the amount of fuel purchased monthly from Appellant. Id. at 92. Using those calculations, Merschat confirmed that Appellant failed to deliver 308 gallons of fuel per week during the entire period relevant to the jury's damage calculation. Id. at 94. Those figures taken together represented a shortage of 42%. Id. at 96. Forty-two percent of the total amount paid to Appellant over the 2005-2014 period, represented the amount of damages requested at trial. Id. at 104. Accordingly, we conclude that this evidence sufficiently established the discrepancy between the amount paid and the fuel received.

Finally, Appellant posits that the amount of the award of damages was speculative. However, as stated above, damages are speculative only if the uncertainty concerns the fact of damages rather than the amount. Appellant does not suggest that there were no identifiable damages in this matter. Moreover, as we discussed in the first issue presented, this case dealt with a scheme wherein it was difficult to ascertain precisely how much fuel was actually delivered. Evidence revealed that Appellant's delivery driver would

pump fuel without first resetting the delivery truck's pump to zero. Without knowing the true starting point of the delivery pump setting for each delivery, there was no direct evidence of the precise amount of fuel Appalachian Timber actually received over the course of the parties' business dealings. Appalachian Timber was able to determine the number of gallons of fuel it consumed for production when it changed service providers. In turn, Appalachian Timber was then able to estimate the amount of fuel delivered by Appellant. More specifically, an evaluation of the total amount paid by Appalachian Timber as compared with the estimated amount of fuel delivered, provided the jury with the reasonable means to estimate its award. As such, we conclude that the jury's award was not based upon speculation and a JNOV was not warranted. Hence, Appellant is not entitled to relief.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2020